of this complaint, (plaintiff suffered facial fractures including the left cheekbone, which was crushed, and was eventually replaced with an implant; fractured orbital socket, (eye socket); facial lacerations below and above the left eye; possible neck, and brain damage, and glaucoma which developed in the injured left eye), the double vision and glaucoma are permanent injury, so to are the cervical spinal injury, and brain damage. The glaucoma is the condition requiring aggressive treatment and faithfullness to that treatment to avoid more versible blindness in one, possibly both eyes.

Dr. Goldsmith, Moran Eye Clinic Ophthalmologist diagnosed and initiated treatment for the glaucoma, and has required plaintiff to have semi-annual followup appointments to check the progress of the glaucoma. Dr. Goldsmith, Ophth. counseled plaintiff to faithfully take two prescribed eye drops. Dr. Goldsmith underscored this need by placing a letter to Prison Officials to ensure his treatment regimine is adhered to. see: Exibit 3(b)(U. of U. Moran Eye Ctr. letter from Dr. Goldsmith; dated: 12-5-05; re: admonish to prov. med. prescr.). Dispite the Doctor's letter stressing the importance to plaintiff's adherence to the treatment regimine; the requirement that there be, "any instances of evenings on which he does not take his medication") there as been many instances, as long as two weeks without a refill.

Plaintiff filed a Fed. R. Civ. Proc. Rule 65a Petition on this and other matters. see: Exibit 59 ( Pl. Pet. TRO & Inju..; pg. 6-7). In that document plaintiff averred that there were two instances where
(pg. 7, 8)

Prison officials did not refill the prescribed medications, (two of them: Travatan, and Timolol), for two weeks, and at least one other instance where they failed to refill the prescriptions for atleast one week. see: Exhibit 53, at 5-6. Also as noted in the Petition, although plaintiff filed two grievances on the matter the Prison has refused to answer them. Also, Dr. Goldsmith has reco mmended semi-annual follow up visits for my glaucoma, but Prison Officials stopped doing so in 2008 and continued to this day. The Prison has willfully refused to provide the recommended treat ment regimine, and the semi-annual follow up of the treating Physician who is a specialist in Ophthalmology without just cause thus demonstrating a deliberate indifference to plaintiffs' serios medical needs.

COUNT IV

The Prison's Contract Attorneys Denied Petitioner Access To The Courts When They Made Extra Copies Of A Petition That Was To Be Filed Ex Parte And Sent The UTah Attor Ney General's Office A Copy. They Further Withheld Petit ioners' Originals And Copies Until The State Could File An Objection To The Petition.

On January 31, 2008, plaintiff was hurriedly trying to finish drafting a Petition For A Temporary Restraining Order And Injun ction Pursuant to Fed. R. Civ. Proc. Rule 65 a, (Jan. 31, 2008 was on a Thursday, and the Contract Attorneys customarily pick up inmate's requests for services, including copies of legal documents on Friday).

Plaintiff was trying to get the petition drafted and copied in order to have them ready for mailing on the following week beginning 2-4-08. Although plaintiff was unable to have the document completed to go into the prison's mailbox for the prison's contract Attorney's office on site at the Utah State Prison, plaintiff was able to go through housing official, Lieutenant Farnsworth who called the contract attorney's office to request an "expedited request for copies of the petition. Lieutenant Farnsworth then hand carried the document to the prison's on-site contract Attorney's office that evening, (1-31-08).

On Monday, February 4, 2008, when mail came, there was no petition and copies, The lieutenant said that I should give it atleast one more day before becoming concerned with it's whereabouts. On Tuesday, 2-5-08, the petition came in the mail, Petitioner then prepared the original for mailing in the U.S. District Court and placed it in the prison's mailbox, In addition, because plaintiff had several incidents where legal mail did not reach its destination, plaintiff had a fellow prisoner, Mr. Ricardo Rodriguez place on the face of the document to be sent to the U.S. District Court, his signature and averment that he witnessed plaintiff place the document in the prison's mailbox on 2-5-08, See: Exhibit 53 (Pet. For TRO & Injunct). The U.S. District Court's Docket Event Statement shows that the petition was filed with a pending 28 U.S.C. §2254 Habeas Petition - See: Exhibit 64 (U.S.D.C.-Ut. #2: 05-cv-365 DB at 23, on 2-4-08.

Plaintiff had a fellow inmate sign on the face of the petition the
(pg. 30)

day plaintiff placed it in the Prison's mailbox. Plaintiff later having
discovered irregularities in the handling of my legal mail, and in an
attempt to provide corroborating evidence of the time line respect
ing the filing of the above referenced Petition for A TRO and In
junction. Plaintiff had mr. Rodriguez sign a notarized affidavit
attesting to when the document was placed in the Prison's mailbox.
See: Exibit 65 (Affid. of Ricardo Rodriguez; dated: 3-3-08.

   When Petitioner recieved a copy of the state's objection, on or a-
bout 2-8-08, Plaintiff was certain that the state's employees were tam-
pering with legal mail because I had not yet sent the copy of
the Petition for A TRO and Injunction to the Utah Attorney General's
Office yet, as the document was intended to be filed ex-parte.
see: Exibit 65 (State's Objec. To Pet's Pet. for A TRO And Injunc; dat
ed; 2-5-08). In this objection Mr. Christopher D. Ballard, Assis-
tant Attorney General claimed, without an iota of evidence that
the Petition for A TRO and Injunction was filed with the pending
28 U.S.C. § 2254 Habeas Corpus Petition, as assertion plaintiff veh-
emently denies, and filed the objection in the U.S. District Court's
Central Division. see: Exibit 66, (Objec. Pet's Pet for TRO & Injunc;
dated 2-5-08.

   Immediately upon reciept of the state's objection plaintiff
filed a memorandum in Response to the objection, and then prepared
to await the U.S. District Court's decision on the matter. On or about
2-20-08 petitioner recieved an Order from The U.S. District court,
(habeas court, Judge Dee Benson), dismissing the Petition for a TRO
And Injunctions. see: Exibit 67 (U.S.D.C.-Ut. Ord. dism. Pet. for

TRO & Injunc; case # 2:05-CV-365 DB; entered: 2-11-08). It appears from the date of the State's Objection to the Petition, 2-5-08, see: Exhibit 66, and The U.S. District Court's Order dismissing the Petition that it took about (4), four days to dismiss the Petition for a TRO And Injunction. See Also; Exhibit 64 (U.S.D.C.-Ut. Dock. Evt. Statint #2:05-CV-365 DB at 23 thru 26). The Plaintiff's "Reply To Response To Motion For Temporary Restraining Order was not even filed until the day after the court's ruling. Thus, the State, including Prison Officials; officials at the Utah Attorney General's Office and the Prison's Contract attorneys office conspired, and acted in concert to defeat the Petition, and to prevent the plaintiff from petitioning the government for redress of grievances, a right protected by the U.S. constitution Amendment I, and they also violated plaintiff's Amendment XIV (equal protection clause), because other citizens are relatively unobstructed in filing the same types of lawsuits. Governmental employees also violated plaintiff's Amendment XIV (substantive due process) rights. This conduct also implicates a Amendment XIV (due process (liberty interest)); a right to correspond with the courts.

    The plaintiff sustained actual injury in that the claims intended were arguable claims, and Though not yet established, the possibility of some sort of settlement could have been negotiated.

    The plaintiff, through the machinations of the state of Utah's Officials was forced to seek review of the U.S. District Court's dismissal of the Rule 65 a Petition under rules governing habeas corpus appellate review, i.e., to seek a certificate of appealability instead of a normal

(pg. 32

appeal.

The plaintiff filed an appeal to the U.S. Court of Appeals for the Tenth Circuit and in one of the responses from the state, see: Exibit 68, (Stated Objec. To Pet's mot for Ord. Req. Pris, To Prov. App. w/ His legal papers, glasses, and Honor med. Clearance, And Resp. to Pet's Objec. To state's use of Elec. Filing sys., pg. 5, para. 3, dated: 5-22-08; Jackson v. Friel, U.S. CSA. 10th Cir, #08-4040), mr. Christopher D.Ballard, Assistant Utah Attorney General averred that his office recieved the above referenced Pet ition from the clerk of the U.S. District Court, and not from the contract attorney's office. This excuse, however, is refuted not only by the Rodriguez Affidavit, Exibit 65, but also by a response to a governmental Records Access Management Act, (GRAMA). See: Exibit 69, (UDC, Exec. Off, re: GRAMA Reqps; pg. 2, para. The mailroom stated that plaintiff sent out a "Privileged envel ope", requiring $1.48 (4.9 oz.). Even if the Rodriguez Affidav it was to be disregarded, the UDC Executive's office stated that the "privileged envelope" went out on 2-4-08. The mail sys tem at this facility picks up the mail from all the housing units between 6:00 to 8:00 am. The mail is then taken to the mailroom and sorted. Once sorted they are then taken to the Draper, Utah main Post office, a process that would not have the "privileged en velope" leaving the Prison's mailroom before eleven, or twelve o'c lock A.M. what ever process it under goes at the Draper site it is extremely doubtfull that the U.S. District court would have recieved the envelope in question the same day even as it takes almost half a day to proceed through the Prison's mailroom. In this case it

( m. 24)

's said that it did in fact go through the mail system in less than a day, the Utah Attorney General's Office then gets notice of an ex parte Petition and is then able to draft and file an Objection almost simultaneously. But, if the Affidavit is to be entertained, as plaintiff has said that the Petition was not mailed by plaintiff until 2-5-08, Neither the U.S. District Court, Nor the Utah Attorney General's Office could have obtained it before the 5th of February, 2008. Finally, in a GRAMA Records Request, plaintiff obtained from the mail room a copy of the records of all outgoing and incoming legal mail during the relevant time; (2-4-08), and their records conflict with the other two accounts; from the Utah Attorney General's Office, and from the D.O.C. Executive, Mr. Thomas Patterson's Office in that the mailroom shows no legal mail was incoming, nor outgoing on 2-4-08. Plaintiff exausted all administrative remedies on the issue. See: Exibit(s) 21 (a), (level II Griev; ref # 990867748; dated: 3-20-08; and Exibit 21 (b), (level II Resp, ref # 990867748; dated: 3-28-08; and Exibit 71(cc), (level III Griev, Resp; ref # 990867748; dated: 6-6-08. See also: Exibit 104, (UDC/DIO mailroom Rec. of incomming & outgoing legal mail; from: 2-1-08 thru: 2-22-08).

## COUNT V

The Utah Department Of Corrections, Utah State Prison, The Utah State Prison's Contract Attorneys; David J. Angerhofer, P.C., Wayne A. Freestone, P.C., And Other Unknown Named State Employees Retaliated Against Plaintiff for Filing Grievances Against Medical Officials, And The Contract

(Pg. 34

Attorneys.

On or about 4-11-08 I was seen in the Oquirrh II housing facility's medical room by a Physician's Assistant, (P.A.), with respect to my medical issues, (my diabetes mellitus, and my spinal injuries), where the confrontation became loud and argumentative. Plaintiff finally exited the medical room, but was followed by the P.A. and the argument continued out in the common area outside the housing sections. Plaintiff went back into the section and assumed the confrontation was at an end.

About (10) ten to fifteen minutes later, an officer, Mr. Ferry entered the housing section and went directly to my cell. Without conducting a cell search, he took an alarm clock/radio from my cell and delivered it to a housing official, Lieutenant, Farnsworth. A few minutes later, I was called out to the common area and to the lieutenant's office. After a brief conversation I was then referred to Captain Hughes who made the final decision to give me a major write-up for possession of contraband. See: Exibit 72, (UDC Discip. form — mD-1; UDC Case# 647569; date: 4-12-08). In addition to the major write-up, plaintiff's privileges were reduced from KQ5, (10:00 pm, max. lockdown time), to GJ1, (eleven am, 11:00 am lockdown level, (almost lowest privilege and lockdown level). See: Exibit 73, (comp. gen. O-Track screen printout, updated by Og. I caseworker, M. Bullock on: 4-16-08.

The above action was in retaliation for my exercising my U.S. constitution Amendment I right to free speech. This fact is borne

(page 6)

out in the fact that nothing in my conversation and arguments with medical officials were the subject of a major, or even a minor disciplinary write-up.

Another factor that may support an allegation of retaliation is that the official who confiscated the relevant radio, Officer Ferry, had been relegated to duty in the control room because of an altercation with himself and an inmate in the housing unit. His first time back in the housing unit, in almost six weeks was to go into my section and confiscate the radio.

Additionally, the sanctions imposed also reflect retaliatory intent. see: Exibit 73, (UDC-O-Track comp. entry; re: adjusted priv. level; dated: 4-16-08. Then see: Exibit 72 (UDC Discipl MD-1 form; UDC Discipl. Case # 647569; dated: 4-11-08. The infraction code for the offense charged is "C 07" which is also regulated by the Utah State Prison's Positive Behavior Reward System, (PBRS). see: Exibit 74, (PBRS Guide for Discipl. at 2). The C 07 write up is considered a "minor disciplinary infraction". This fact is borne out by the disciplinary sanctions that were meted out by the same persons who applied grossly excessive sanctions upon plaintiff, and also just after plaintiff was punished, (severely), other inmates recieved substantially lighter sanctions, those setforth in the PBRS Guide.

There were atleast (3) three other inmates who recieved the same disciplinary infraction whose sanctions were commensurate with the strictures setforth in the PBRS; Exibit 74. Then see:

(pg. 36)

Exhibit 75 (handwritten, (verbatim) excerpt from UDC Inmate Policies & Proc. Manual: FDr 01/06.03), Exhibit 75 sets forth the elements of the offense charged.

The issue of arguments with medical personnel was already being retaliated for by medical personnel, see: Exhibit 45 (level I Griev; ref.#990869016; re: retal. by med. personnel; dated: 7-4-8); then see: Exhibit 46, (level II Griev. Resp.; ref.#990868068; re: taking meds. and "giving med techs problems"; dated: 5-29-08).

Plaintiff filed a grievance on the matter, see: Exhibit 76 (a), level I Griev.; ref.#990868166; re: confron. w/ P.A. Logson, & Retxl.; dated: 4-12-08), then see: Exhibit 76 (b), (level III Griev. Resp. by: T. Anderson, Hring officer; ref.#990868166; re: retal. by med. personnel; dated 8-26-08).

Contemporaneous with the events described above, the Prison's contract attorneys had also provided the Utah Attorney General's office with a pleading plaintiff had forwarded to the contract attorneys for copies, and petitioner would then file the petition ex parte. This action resulted in the petition being denied in the U.S. District court - Utah. see: Complaint COUNT IV, supra. After being accused of possession of contraband plaintiff was then moved to Oquirrh I, section 2 which was then being used to house "management problems", and other inmates who were effectively being "dumped" by other housing facilities.

Racial Discrimination And Retaliation

(pg. 37)

In being moved to Oquirrl I, plaintiff was housed with another inmate who was being "dumped" from Oquirrh II as plaintiff was. This inmate had some living habits that made him the most un desireable inmate to be housed with. This inmate, Mr. Hofen, would constantly emit gas to the point of making it difficult to breathe. Finally, and perhaps worst of all, he had a habit of not using the toilet to defecate until moments after we were locked down dispite his numerous opportunities before hand. Plaintiff tried to reason with Mr. Hofen and pointed out that I was making every effort to prevent him from being affect ed by my body oder, and strongly urged him to do the same. Although Mr. Hofen said he would, he never did. Finally, I asked Mr. Hofen to move to another cell. Mr. Hofen argued and refused to move, and he got down off the top bunk, (note: one of Mr. Hofen's major complaints was that his "bottom bunk clear ance had expired, and he wanted a bottom bunk), and he went direct ly to the intercom at the section door and announced to housing officials: "I've just been attacked by a black man".

Instantly, the housing officials locked down the entire section and came to plaintiffs cell and ordered plaintiff to submit to be ing hand cuffed. Plaintiff was then taken to a wooden bench between housing units and was restrained to a wall, (hand c uffed to a rail on the wall), for approximately (6), six hours.

Approximately six hours later, an official from the prison's inves tigations Department came and spoke with plaintiff about the in cident. The investigator stated that their Department was declin

(pg. 38)

ing to file any charges, but informed plaintiff that the Prison said they would be "handling the matter administratively." What that meant was that they were going to place plaintiff in maximum security.

When plaintiff next saw housing officials plaintiff was informed that plaintiff was to be given a major disciplinary write-up, and if found guilty, would be reduced in security level from level 3, (general population), to level 2, (maximum security). Prison officials were constrained to strict Prison Policy in the procedure for 1). Placing an inmate on TRO, (temporary restraining Order), a 2) reduction of security levels, see: Exhibits: 77, (verbatim Excerpt of Inmate Policy manual FC 04/08.03(B) Temporary Restraining Order. Prison officials in my case did not adhere to any of the policy for placement on TRO because they placed plaintiff into a cell with another level II inmate, (the Prison has a longstanding and strict Policy in keeping levels I and II inmates seperate from level III inmates. Plaintiff filed a classification challenge to the classification Review Officer. Plain tiff challenged the TRO procedure, and the classification score for reduction in classification, and also that plaintiff was not given an opportunity to be heard or be informed of the charges against plaintiff. see: Exhibit 77.

After approximately three weeks to one month in maximum sec urity, plaintiff was served with a major Disciplinary write-up. see: Exhibit 78 (a), (Disciplinary MD-1 form; UDC Disciplinary Case # 647806; dated: 4-28-08).

( pg. 20 )

The retaliatory and discriminatory purposes is exemplified in the Prison's responses to plaintiff's grievances on the matter. See: Exibit 80 (a) (level I griev.; ref. # 990868402; dated: 4-29-08; re: racial discrim.); Exibit 80 (b), (level I Griev. Resp.; ref. # 4908 68402; re: racial discrim; and dated). Then see: Exibit 80 (c), (level II Griev. App.; ref. # 990868402; dated: 6-9-08; Exibit 80 (d), (level II Griev. Resp.; ref. # 990868402; dated: 7-9-08; re: racial discrim.) Then see: Exibit 80 (e), (level III Griev. App.; ref. # 990868402; dated; 7-16-08), Then see: Exibit 8 (f), Throughout the level III hearing officer's recitation of his version of the facts, he never once mentioned that the IDHO had also interviewed witnesses who denied plaintiff ever struck the alleged victim. These witnesses' statements, and the lack of any physical evidence of an assault is what the IDHO based his findings on.

Although "inmates have no right to be housed in a particular cell, section, unit, or facility," plaintiff asserts that Prison Officials may not deny prisoners privileges for purposes of discrimination or retaliation, thus, the Prison Officials and other persons acting under color of state law violated plaintiff's U.S. Constitution Amendment XIV (substantive due process rights), when Prison Officials employed retaliatory tactics to take plaintiff's privileges including plaintiff's custody levels; Equal protection Clause violation when Prison officials, acting upon a racially motivated accusation by a fellow inmate; punished plaintiff for conduct that was determined by the In House Disciplinary Hearing Officer, (IDHO) that plaintiff was not guilty of. Prison officials also violated plaintiff's U.S. constitution Amendment I (right to
(pg. 43)

petition the government for redress of grievances, and Freedom of speech). The Prison Official violated Plaintiff's U.S. Constitution Amendment VIII (deliberate indifference to a serious medical needs) right, and Amendment XIV (privileges and immunities clause), and Title II of the Americans With Disabilities Act of 1990 (ADA), 104 stat. 337, as amended, 42 U.S.C. §12131 et seq. (2000 ed. and supp. II), because when Prison Officials placed plaintiff in maximum security, the medical Department refused to adjust plaintiff's insulin medication commensurate with the change in living conditions.

## COUNT VI

Prison Officials And Contract Attorneys Violated Plaintiff's Constitutional Rights To Petition The Government For Redress Of Grievances And Plaintiff's Liberty Interest In Correspondence And Substantive Due Process Violation When Contract Attorneys Were Given Plaintiff's Legal Papers To Search For Any Evidence That Would Lead To Civil Liability, And To Prevent Plaintiff from Prosecuting Pending Cases In The Courts

Plaintiff was in the process of drafting and forwarding to the U.S. District Court a Federal Rules Of Civil Procedure Rule 65 (a) Petition for a TRO and Injunction on or about 1-28-08. Upon completion plaintiff made every effort to have the petition copied and then mailed to the U.S. District Court before the month of February 08. Plaintiff asked Lieutenant Farnsworth of Oquirrh II Facility (no. 43)

to call the contract attorneys to see if they could provide copies of the petition in an expedited manner. They agreed and Lieutenant, Farnsworth hand delivered the document to the contract Attorney's on-site office. On or about 2-4-08, plaintiff asked Lieutenant Farnsworth to call the contract attorneys to see if they had completed the request for copies and to have the copies and originals returned to me. Lieutenant Farnsworth said that the documents would probably be ready in another day and suggested that plaintiff not be concerned until atleast another day. If they did not come, he would give them a call then. On Tuesday, February 5, 2008 plaintiff recieved the documents in the mail which were then placed by plaintiff back in the Prison's mail system destined for the U.S. District Court. On or about 2-8-08 plaintiff recieved an Objection to the TRO and Injunction Petition from the Utah Attorney General's Office, specifically Mr. Christopher D. Ballard, Assistant Attorney General's Office. Plaintiff was incredulous to recieve the Objection from the Attorney General's office because I had not yet sent a copy of the ex parte Petition yet. The Petition was commingled with the pending §2254 Habeas Corpus Petition, and without any opportunity to be heard on the filing, i.e., (if it was independent of the Habeas Corpus Writ), The U.S. District Court-Utah dismissed the Petition. The Prison's Contract Attorneys had given the Utah Attorney General's Office a "heads up" respecting the anticipated filing and provided them a copy of the ex parte document and it was thus defeated even before plaintiff could forward the petition to the courts.

Petitioner wrote grievances, see: Exibit 81 (a), (level III Griev. (pg. 144)

Resp.; ref. # 990868527; re: Confisc. of leg. Papers; dated: 9-4-08).
Even before the level III Grievance response was made, plaintiff had
asked Prison Officials for another means of obtaining copies of leg
al documents because the contract attorneys had committed uneth
ical conduct respecting the preparation and filing of legal doc
uments against their pay master; State of Utah; Utah Department
of Corrections; and that the plaintiff was preparing to file a law
suit against the contract attorneys. see; Exhibit 81 (b), (letter to;
mr. Steve Turley, Warden U.S.P.; re: access to copy of leg. doc.; dated:
2-25-08. (please note: this letter, and grievance predate my reduc
tion in security assessment and placement in max, where I was
denied this request. see: Exhibit 81 (c), (letter to plaintiff fr
om mr. W.T. LaBounty, Deputy Warden, U.S.P; re: den. req.
for copies of leg. doc.).

The Prison Officials, including the Warden's Office were on
notice that the contract attorneys were parties in a lawsuit
well in advance of the racially discriminatory and retaliatory
acts discribed in COUNT V. see: Exhibit 81 (d), (Inter Off.
memo. by: Melissa Walker, Warden's Office; re: Plaint. letter req. copies
of leg. doc.; dated: 2-29-08. Yet, when the occasion presented
itself, (the major write up and transfer to maximum security),
Lt. Farnsworth confiscated all but two small zip lock plastic
pouches with legal documents and gave them to the contract
attorneys ostensibly for the determination whether the docum
ents were legal or not. see: Exhibit 82 (a), (level I griev. Resp.;
ref. # 990868527; and Exhibit 81 (a)).

The record shows that the contract attorneys received the (legal) papers between 4-28-08, and 5-2-08, when they claimed to have gone through my legal papers and "returned them to the facility to be returned to you" (to plaintiff in this case); see: Exibit 84, (U.S.P. Contr. Atty. ltr.; re: search of plaint. leg. doc.; dated; 5-2-08).

Prison officials were well aware that plaintiff was engaged in litigation in several courts at that time. see: Exibit 85, (ltr. to Capt. O'Bray, Uinta IV (maximum security facility); re: return of confis. leg. doc., and notice of pending court filings). Prison officials did not release the documents back to plaintiff until the due date of the last filing deadline date; 7-8-08. see: Exibit 86; Supr. Ct. of Ut. Ord.; case # 20070588 CA; dated; 5-12-08). In addition to several letters to both the Warden of the Utah State Prison, see: Exibit 81 (cc); (U.S.P. Og. for 'l. Depty. Warden, W.J. La Bounty; dated; 3-4-08); see also: Exibit 87, (level II Griev. Resp.; ref. # 990868527; re: return of leg. doc.; para. 2; dated; 7-8-08). When the legal papers were returned, they were in extreme disarray, and many of the copies of case law had been purposely mixed up, and many pages were missing usually about the middle numbered pages, although there were some where the top page was missing and some cases were missing completely.

Also, Prison officials confiscated many legal reference books including a Utah Court Rules Annotated; Utah codes Annotated, Vol. 4; self help litigation manual, (All In A Nutshell self help

(con. V1.

litigation manual), a Black's Law Dictionary; several copies of his
on legal News Periodicals, and other legal reference materials,
and some loose leaf copies of Federal Habeas Practice; and a
Georgetown Annual Review of Criminal Procedure book. Half of these
items were confiscated upon plaintiff's entry into maximum
security, see: Exhibit 88, (level III Griev. Resp.; ref # 9908 68 566,
re: confis. leg. papers; dated: 9-4-08; and the remaining legal
materials and papers were confiscated upon being moved from
Uintah II back to Uintah IV and out of the Uintah facilities alto
gether, see: Exhibit 89 (a), (level II Griev. App.; ref # 9908 72 020;
re: confis. of leg. materials; dated: 7-28-09); and Exhibit 89 (b)
(level II Griev. Resp.; ref # 9908 72 020; re: confis. leg. materials;
dated: 8-12-09); Exhibit 89 (c), (written den. by Off. J. Sparks; re:
# 9908 72 020; dated: 6-27-09); and then see: Exhibit 89 (d), (level III Gr
iev. Resp.; ref # 9908 72 020; re: confis. leg. materials; dated: 8-27-09).


   Although Officer Sparks claims that she confiscated many "books, paper
pamphlets, and periodicals that had other inmate's names on them,"
she did not retain any of these items as prescribed by policy, see:
Exhibit 90, (UDC/DIO Inmate Policy man.: FD-r 14/04.06 (A)(3),
Reg. used Propty excerpt). There is no evidence of officer Sparks
ever utilizing the "PR-1 form", nor is there any evidence that Off
icer Sparks sent the confiscated property to the property room as
prescribed by UDC/DIO Policy. Furthermore, she denies confis
cating the items plaintiff alleged were taken, and Prison Officials su
ggest that her word is to be taken as true first that the items were
not identifiable, and second, that these items were "stolen", as
she claimed in her written response to grievance # 9908 72 020.

Exibit 89 (c).

Because Prison Officials confiscated, and disposed of some of plaintiff's legal documents, including case law, and was retained for almost (3), three months, while plaintiff had ongoing court filings and responses to respond to, plaintiff was without pertinent caselaw, statutes, or rules, or ordinances, plaintiff's cases were thus dismissed, see; Jackson v. State of Utah, Ut. S. Ct. # 20070588-CA; Jackson v. Friel, U.S.D.C. - Ut.; Case # 2:05-CV-365 DB; Jackson v. Turley, U.S.D.C. - Ut., Case # 2:08-CV-00382 TC; Jackson v. Friel, U.S.C.A. 10th Cir, Case # 08-4040; Jackson v. Friel, U.S. S. Ct, Case # 08-8760. Prison Officials thus violated plaintiff's rights to Access to the courts; they also violated U.S. constitution Amendment I (right to petition the government for redress of grievances), U.S. Constitution Amendment XIV (Equal protection; due process, and substantive due process, and the liberty interest attendant to the right to correspond)).

COUNT VII

Prison Officials Confiscated Plaintiff's Pleadings To The U.S. Court Of Appeals For The Tenth Circuit Denying Plaintiff Access To The Courts And The First And Fourteenth Amendment To The U.S. Constitution.

The U.S. District Court entered a memorandum Decision in Case # 2:05-CV-365 DB in a 28 U.S.C. §2254 Habeas Corpus (pa, 48)

Petition on: 12-9-08. Plaintiff filed a timely Motion To Alter or Amend The Judgment on: 1-14-09. The U.S. District Court denied the motion on: 9-8-09. Plaintiff then filed a timely Notice of Appeal on: 9-15-09.

In the interim, plaintiff located cases that referenced a Stay in proceedings on a §2254 petition so plaintiff could return to State Court to exaust State remedies. Plaintiff drafted, and forwarded a motion for a stay to the Habeas Court on: 11-5-09. On 11-23-09, the State filed an objection to plaintiff's motion for a stay, arguing that since the plaintiff had previously filed a Notice Of Appeal the habeas court was without jurisdiction to grant a stay. On 11-25-09, the U.S. District Court, (habeas court) denied the motion for a stay. Upon notice from the U.S. District Court denying the motion for a stay, plaintiff then drafted and forwarded through the Prison mail system a motion for a stay to The U.S. Court of Appeals for the Tenth Circuit on 11-29-09. Plaintiff, in addition to citing relevant case law, cited to 28 U.S.C. §2251. This statute could have been used to obtain a stay, or could have been the subject of appeal to The U.S. Supreme Court. See: Exibit 91 (a), (mot for Stay of Pet. Pend. Exam. Of Issues In st. Cts; case # 09-4173; dated: 11-29-09); and Exibit 91 (b), (memo, In Supp, Mot for Stay; case#09-4173; dated: 11-29-09.

When plaintiff had no response to the motion and supporting memorandum for a stay, plaintiff sent a letter to the Clerk's Office of the U.S. Court of Appeals 10th circuit. See: Exibit 92 (a), (letter to U.S.C.A. 10th cir, Clerk's Off, re: mot. & Supp. memo, for stay; case # 09-4173;

dated: 1-1-10), The U.S. Court Of Appeals Clerk denied recieving the motion or memorandum, see: Exibit 92 (b), (letter from: Clerk of U.S.C.A. 10th cir; re: mot. for stay; case # 09.4173; dated: 12-22-09).

Plaintiff could have appealed the denial of the motion alone to the U.S. Supreme Court and if Plaintiff were to have prevailed, the relief would have litterally meant the difference of freedom versus incarceration, or the plaintiff could have returned to state habeas court to present an issue that was previously raised in the state habeas proceedings, but was not addressed by the state court. Additionally, the plaintiff could have raised an affirmative defense of "involuntary intoxication"; presumably under the doctrine of: "the interest of justice", and ineffective assistance of counsel, both trial counsel for not raising it as a defense, and appellate counsel for not raising trial counsel's ineffectiveness on direct appeal. Thus, the Prison Officials Violated plaintiff's U.S. Constitution Amendment I, (right to petition the government for redress of grievances); Amendment XIV (substantive due process rights; liberty interest in correspondance with the court; equal protection; and denial of right to access to the courts. see: Exibit 105; (level III Griev. Resp. ref # 0908 745 26; dated: 3-18-10

## COUNT VIII

Prison Officials Violated Plaintiff's Eighth Amendment Rights When They Acted In Contravention To The Medical Department's Medical Clearance For Double-Cuff Clearance For Shoulder Injuries

On or about 4-13-06 plaintiff was being housed in the Wasatch IV maximum security unit and was notified of a follow-up appointment at the Moran Eye Clinic regarding my glaucoma.

A transport officer came to the Wasatch facility to prepare plaintiff for transport. When the officer applied the restraints, (handcuffs looped through a chain around plaintiff's waist and fastened at plaintiff's back, and a pair of leg cuffs), plaintiff advised the transport officer that I had a medical clearance for double cuffs during transport because of shoulder injuries. The transport officer said that there was no medical clearance on file, that he had checked the computer and there was no clearance. The transport officer had used a single pair of cuffs, and had applied them with the palms of my hands faced away from each other.

When we arrived at the Northgate facility I again asked the transport officer to place two cuffs on and to do so with my palms facing each other. Again he refused. This time however, he went and got his immediate supervisor, Sergeant Healey. She came out to the vehicle and looked at the cuffs and said in a brusque manner and tone; "there is nothing wrong with the way the handcuffs were applied, that there was no medical clearance in existence and that I should just shut up and quit complaining." Plaintiff requested several times to be taken to the medical unit where my medical condition could be verified by a physician and the clearance given directly to the transport officer. The Sergeant refused.

The Transport officer and the sergeant undid the handcuffs and
( on. 5l )

turned my hands, palms facing each other, and then attached another set of handcuffs. Instead of applying them where my hands were not soo close that they were touching, they attached the cuffs to the chain around my waist and the other end between the cuffs that were already applied. Thus, the extra set of cuffs in no way alleviated the pain I was experiencing and the pain the medical clearance was intended to prevent. In fact, when they placed the extra set of cuffs on, they tried to mislead me into believing that they had in fact applied the double cuffs in a manner commensurate with the spirit of the medical clearance.

The transport officer then drove me to the Moran Eye Clinic in Salt Lake City, Utah all along the way I complained to the transport officer that I was in terrific, and constant pain. The transport officer acted as though he did not hear my constant complaints and entreaties.

When we arrived at the Utah medical center, I again asked the officer to take me to the secured area at the medical center where prisoners are routinely held until they were to be seen by a health care provider and adjust my handcuffs. The transport officer again refused. At this point in time another transport officer was present along with another inmate who had a medical appointment also. This officer put in that the only way I could have my restraints adjusted, or removed was if I were to refuse treatment and go back to the prison.

Plaintiff waited another half an hour or so till the health care provider was available to see me. I told the healthcare provider that my restraints were causing me unbearable pain and that I would have to go back to Prison to get them removed. I told the provider that I was not refusing health care, but that going back to Prison immediately was my only option, so I had to go.

The transport officer then took me back to the vehicle and proceeded back toward the Prison. All along the way I complained and moaned. The pain became so great that I felt panic overtake me and I felt on the edge of a mental breakdown, but still the transport officer seemed oblivious to my great suffering. In fact, the transport officer seemed to be driving even more slowly back to Prison than he drove away from the prison and seemed to be enjoying my torment.

Upon arrival back to the Prison the Transport officer stopped at least twice and got out of the vehicle and went into two different buildings and he seemed to be taking as much time as he could in an effort to maximize my pain and suffering.

When the officer finally took me back to the Uintah Unit he did not remove the cuffs until I was in a holding cell. Immediately after the transport officer removed the cuffs, an Officer from Uintah IV came and told me that if I don't "cuff up", (where he placed cuffs on in the same manner as the transport official), that he would go get the lieutenant of the unit. When I was finally taken back

( 24, 52 )

to the housing unit only then did they remove the cuffs. The entire ordeal appeared to have been orchestrated to cause as much pain as they could possibly cause.

Plaintiff filed a grievance. see: Exibit 93(A), (level II griev. resp; rec.# 990861416 ; re: medi clear, double cuff clearance; dated: 7-14-06). Plaintiff exausted the grievance with no resolution. see: Exibit 93 (b), (level III Griev. Resp.; rec # 990861416 ; re: double cuff clear; dated: 8-23-06).

The medical clearance at that point in time were all placed in the computer and an inmate would never know if's medical clearance was current or not, nor if medical personnel had actually put them into the computer. Later, however, the Prism's medical unit began providing medical clearances with hard copies of computer entries. see: Exibit 93 (c), (UDC med. Unit - M-Track entry; re: medi. doub cuff clear; effective date: 2-24-09 thru 2-19-10.

Since that incident complained of above, about (2) years later, when I was again scheduled for a semi-annual followup appoi ntment respecting my glaucoma condition. The transport officials again indicated that there was no double cuff clearance. When I re quested that they take me over to the medical unit to have the medical clearance restored so I could make the appointment, those transport officers took plaintiff directly to the medical unit. Once there, I was met by a medical technician who indicated that I had no double-cuff clearance. When I insisted that there had been a double cuff clearance for the past several years, and my shoulder
(was SW)

injuries had not been surgically corrected, the need for the double cuff clearance was very much needed and that I could not go to the University of Utah Medical Center without it, the medical technician then asked, "so you are refusing treatment?" Plaintiff clarified for the medical technician that I was not refusing any medical treatment, but I was trying to avoid the horrific pain and suffering I experienced two years before as set forth in this count. The med. tech. then produced a refusal of treatment form that he already had in which and upon my arrival, but I refused to sign it primarily because I was not refusing treatment; I was trying to avoid needless pain and suffering. The medical Department did not issue the double cuff clearance that day, and consequently I missed my appointment. About a year later when I had not gone to the Moran Eye Clinic, I wrote the medical unit and requested scheduling of a follow up appointment. The medical unit basically refused, and placed the responsibility upon me, see: Exhibit 94, (UDC/DIO Clin. Serv. memo. by: Dr. Garden, Clinical Serv. Head official; re: resched. med. followup; dated: 7-14-09).

Although the specialist at Moran Eye Clinic has since done a followups medical examination, he expressed the need for semi-annual, i.e., every six months checkups but the prison has not complied.

The Transportation official's refusal to observe the medical clearance, and his refusal to take plaintiff to the medical unit to get the clearance verified, plaintiff was subjected to almost in
(pg. 66)

discribable pain and suffering, and the unnecessary pain and suffering was intentionally, and maliciously prolonged as long as possible thus violating plaintiff's U.S. Constitutional Amendment VIII (cruel and unusual punishment, and deliberate indifference rights).

## COUNT IX

Prison Officials Maliciously Planted A Shank In Plaintiff's Cell, Conducted An Ostensible Shakedown And Produced The Weapon. This Weapon Was Maliciously Used To Send Plaintiff Back To Max. This Act Was An Act Of Retaliation For Plaintiff Filing A Lawsuit For Constitutional Rights Violations Including Dis Crimination In Prison Employment On The Basis Of Race And Disability And Retaliation.

On or about 4-28-08 Plaintiff was wrongfully placed in maximum security in retaliation for plaintiff's confrontations with medical personnel respecting medical treatment for serious medical needs, and also for accusing the Prison's Contract Attorneys of unethical handling of plaintiff's ex-parte pleadings to be filed in the U.S. District Court; and also because of unfounded and racially motivated allegations of assault on an inmate, (upon plaintiff's cell mate). The Prison Officials contrived a reassessment of plaintiff's security level in order to place plaintiff in max again approximately (4) four to (5) five months after getting out of max on or about 6-6-09.

When plaintiff left max in about 6-6-09, plaintiff was placed back in Oquirrh & from where plaintiff was discriminated against

(pg. 56)

also where plaintiff made grievances and filed a lawsuit against the same housing staff, Lieutenant, Farnsworth, and Captain Hughes. These two officials facilitated plaintiff's second trip to max without just cause, and for retaliatory purposes. Just like in the first incident, see: Exibit 78 (a) & (b), plaintiff was again given a major disciplinary writeup, and just like in Exibit 78 (b), plaintiff was again found "Not guilty". see: Exibit 95, (UDC Discipl. find. form: MD-2; UDC Discipl. case # 657545; dated: 1-27-10). As before in Exibit 78 (a) incident, prison officials were in a position to reach the same conclusion the (IDHO) reached in the assault & battery allegations, and the witness in the second incident, Exibit 95, actually did reach the same conclusion.

The retaliatory component of this count is also demonstrated in the allegations of discrimination on the basis of race with respect to Prison employment. see: Exibit 96 (a). see also: Exibit 96 (b), (Level II Griev. Resp.; Ref. # 9408 72982; re: job discrim; and housing issues; dated: 11-16-09. Then see: Exibit 96 (c), (level III Griev. Resp.; ref. # 9908730065; re: job discrim; dated: 11-16-09.

The record shows that the housing officials, namely Captain Hughes, and Lieutenant, Farnsworth contrived a weapons possession charge contemporaneous with plaintiff's filing grievances respecting both moving from the Oquirrh I facility, and prison employment. see: Exibit 96 (a), 96 (b), and 96 (c), (Note: the date of Exibit 96 (a) thru Exibit 96 (b), then see: Exibit 95, (DOC Discipl find. form: MD-2; UDC Discipl. case # 657545; dated: 1-27-10.

(pg. 57)

The grievances were filed just prior to the major write up was made.

During this same period of time plaintiff was pressing the Dept. of Corrections for statistical data and information that would corroborate my allegations of racial discrimination in Prison employment, see: Exibit 92, (State of Ut. Rec. Committ; Decis & Ord., case # 10-3; dated; 2-18-10.

There are several black inmates here at Utah State Prison who would readily testify that they to have been discriminated against respecting prison employment and other programs and activities. Contrary to Level III Grievance Hearing Officer's contentions; discrimination on the basis of race in both housing, and Prison employment does exist, and recent changes in Utah State Law only increases the burden those affected by this kind of discrimination on the basis of race must endure, see: Exibit 98, (St. of Ut. Legis.; 2009 Gen. Session; HB-100; chief sponsor; Carl Wimmer; re; State Crim. Code; and St. Inst. Codes; UCA § 64-13-30; and § 64-73-33).

In addition to violations of the constitution Amendment XIV (equal protection Clause) the privilege and immunities clause is also implicated. Also, the U.S. Constitution Amendment I (right to petition the government for redress of grievances. And plaintiff also asserts that these acts and omissions violate the U.S. Constitution Amendment IX (enumerat
(pg. 58)

(im of rights)

## COUNT X

Prison Officials And University Of Utah Medical Center's
Medical Specialists Denied Plaintiff Adequate Medical Treatment
For Serious Medical Conditions Because Plaintiff Filed Medical
Malpractice Lawsuit Against Prison Employees And Constitute
im ol Rights Against Against Plaintiff

The plaintiff has suffered lumbar spinal pain, and also cervical
spide pain from Injuries sustained from 1990 (lumbar spine),
and about 1988, and again in 2003 involving cervical spine.

In about February, 2006, plaintiff begin to experience incred
ible pain in the lumbar spide and was seen in the Central
Utah Correctional facility, (CUCF) post Subsequently had a Magnetic
Resonance Imaging (MRI) procedure for diagnosing the condition.
The procedure yielded several problem areas. see; Exibit 29 thru 34(b).

The Specialist, (Orthopedic, and neurologist), first determined that
surgery intervention was appropriate for treating the symptoms in
both the cervical and lumbar spinal problems. see; Exibit 30,
(UDC medi Outside Consul Ord, dated; 8-14-06; see; Diag.).

the specialist then on or about 11-13-07 determined that
plaintiff was, "Not a candidate for Surgery," see; Exibit 32 ad UDC Med.
Outside Consul Ord; dated; 11-13-06. The same treatment physio

ians ordered, "pain management for headaches, neck pain, and back pain". Exibit 32, see: Count I supra, respecting the pain management complaints.

Although plaintiff continued to experience significant pain and mobility problems, and problems sleeping, The Prison medical officials refused to do anything but dispense four, (4) Tramadol, 50 mg Tablets per day for pain. On many occasions third's a treat ment regimine was solely inadequate and Prison Officials who had then asserted sole responsibility for plaintiff's "pain managem ent", even discontinued plaintiff's pain medications because of an anonymous notation in O-Track that plaintiff was "diverting medications". The pain management quickly became an instrum ent for punishment for what Prison Officials determined was, "negative behavior," see: Exibit 46, para. 3.

Plaintiff made repeated efforts to obtain adequate pain manag ement and when that was proven to be futile, plaintiff pressed Prison Officials to obtain surgical intervention.

On or about 9-5-09, plaintiff obtained another (MRI) of the cervical and lumbar spine as both were causing unrelenting pain and mobility difficulty. This condition affected the quality of sleeping, sitting, standing, bending, ect. The "Provider Reports", see: Exibit 34 (b), and (a), many of the conditions found to be present on the last (MRI), see: Exibit 31, (see: findings: at L4-L9; and, see: impress ions); are again Widely space in reference to "previously discribed severe stenosis is mildly improved." in Exibit 34 (b). The above

(pg. 60)

was referenced to the lumbar spine. In exibit 34 (a), The find ings were that the "findings are progressed from previous examin ation with most affected level at ≤5-4, 2nd C 6-7 "

Subsequent to the (MRI), and the standout "provider Reports", plaintiff was seen by medical Specialists at the University of Utah medical Center via tele-med. A doctor, Kennon Tubbs has historically denied plaintiff adequate treatment for the above dis cribed conditions, and also for plaintiff's diabetic condition. In fact, Dr. Tubbs, when plaintiff was in the infirmary, threatened that if plaintiff continued to be confrontational with medical technicians about the "pain management regimine, (Tramadol, and Elavil), he said, "if you give any of my med techs any more pr oblems I will again take your pain meds". see; Exibit 45, (lev el I Griev.; ref # 940869016; dated: 7-4-08); and Exibit 46, at para. 3; and Exibit 42 (griev. level III; ref #990866946; dated; 6-10-08).

When plaintiff encountered medical specialists via tele-med, the doctors, dispite all the explicit medical findings by diagnosticians in Exibites) 30 thru 34 (b), the doctors plaintiff consulted with at tele-med stated that they could not find anything in the records or (MRI) to the complaints I presented to them. These medical officials then suggested that they take me off the pain medications I was taking and place plaintiff on a class of drougs referred to as NSAIDS. see; Exibit 43, (UDC / M- Track entry; dated: 11-1-07; and Exibit 41, (level III Griev. respi; ref. # 9908 67311; re: approp. treatmnt for spinal injuries). This suggestion made it clear that they had been

( pg. 61)

some discussions between Prison medical Staff, and those at the U. of U. medical center outside of plaintiff's presence, and the specialist's apparent antagonism was at least in part based on that communication with Prison Officials without an opportunity to challenge or rebutt the Prison Official's view of the facts. Also, the treating specialist also made a completely new diagnosis of my spinal injuries and pathology as being "rheumatoid arthritis." This new diagnosis was clearly against the well documented diagnosis provided as late as 10-29-09, see: Exibit 99 (a), (Univ. of Ut. med. Ctr. Neurosurg. Consult Rept.; dated: 1-15-10).

Medical officials at the Prison, and also the Department Of Corrections are indeed aware of the medical malpractice and constitutional rights violations lawsuit because Prison Officials participated with Joni J. Jones, Assistant Utah Attorney General in the "martinez Report" that was used to dispose of the case: Jackson v. Utah, 6th Dist. ct.; case # 040600383, see also: Exibit 17, (State's mot. To File mart'n z Rept.).

Additionally, plaintiff filed a grievance on the matter, and exausted all administrative remedies. see: Exibit 100, (level III Griev. Resp.; Ref. # 9908 74654; re: access to adequate med. and pain management; dated: 3-31-10).

The Prison medical officials, including Dr. Kendon Tubbs, and medical officials at the University Of Utah medical center subjected plaintiff to unnecessary pain and suffering in violation of the U.S. Constitution Amendment VIII. Also violative of this Amend

ment is the Prison Officials withholding pain medication for "giv
ing medical Technicians problems," which is alleged to be "cruel
and unusual punishment under U.S. Constitution Amendment VIII;
Amendment I, (right to petition the government for redress of griev
ances); Amendment XIV (Privilege and Immunities Clause); and the
equal protection clause), and also Title II of the Americans with
Disabilities Act, (ADA), 104 Stat. 337, as amended 42 U.S.C. §12
131 et seq. (2000 and Supp. IV) see: Exibit(s) 101(a), (level I griev;
ref. # 99081774; re: ADA accom. for spinal inj; dated: 2-21-08);
and Exibit 101(b), (level II Griev. Resp, ref. # 99086777 4; re:
ADA accom.; dated: 4-16-08); and Exibit 101(c), (level III Griev.
Resp., ref. #99086777 4; re: ADA accom.; dated: 6-11-08); Plaintiff
also made specific requests for pain relief, and second oppinion
respecting diagnosis and treatment. see: Exibit(s) 102(a), (Offen
Req: ADA accom. form; re: Cervical spine; dated: 1-22-08);
Exibit 102(b), (Offen. Req. ADA accom.; re: C. spine pain contr.
and treatment; dated: 1-22-08); and see: Exibit 102(c), (U.S.P.
Dq. Fac. memo. from: W.J. LaBounty, Deputy Warden; dated: 1-28-
08).


## COUNT XI

The Utah State Prison Employees Denied Plaintiff Constit
Utional Rights When The Prison Employees Denied Plaint
iff Prison Employment At the Utah Correctional Indus
Tries, (UCI) Work Program Because Of Discrimination On
The Basis's Of Race and Disability.

Plaintiff has been an inmate at the Utah State Prison since about May 29, 1999. Plaintiff's first prison employment was in the Prison's Culinary Department for approximately seven months. Plaintiff voluntarily terminated that position, (pots and pans washer), because the conditions of plaintiff's employment changed, i.e., I was required to do both my job and my co-worker's job.

In December, 2000 I was hired at the UCI Printshop, worked first in the Bindery section, but was soon placed as a paper cutter. Plaintiff was later placed as a printing press operator. As a diabetic, I would bring "supplimental foodstuffs to work with me, to arrest the onset of hypoglycemia. I was then told by housing offic ials I could no longer take snack foods to work with me; "Nothing in, and nothing out", (of the housing unit). Prison officials told pla intiff they would provide a "snack box" from the culinary, but then never did. Consequently, I began to have frequent hypoglycemic re actions. The supervisor of the UCI Printshop then demoted me and placed me in the bindery section again. I filed a grievance, and at level II of the grievance the UCI/Inmate Coordinator, mr. Kelly Long told me that if I continue to seek redress I would never work for UCI again. I continued to seek redress, (I filed a Ut. R. Civ. P. Rule 65B Petition for Extraordinary Relief), and thereafter I was terminated in 2001. Since that date I have worked less than a year in at least (9), nine years.

Due to recent state legislation; see: Exhibit 98 (2009 Gen. Sess; HB-100, Utah legis.), significantly increased the amount of med (m. 68)

ical co-pay, and a host of other medical related charges, and also enacted a means of obtaining these funds in the arrears after an offender is released from Prison and Parole. Plaintiff is struggling with chronic illnesses, and chronic physical injuries. Plaintiffs' Inmate Trust Account Balance is approximately 3,500. in the red, and thanks to House Bill 100, the amount in arrears is rapidly escalating.

Since about October, 09 the Prison has posted UCI jobs positions in housing Units, (both Oqnirih I and II). The combined UCI job positions posted totals well into (200), two hundred or more job positions. Although I have submitted job applications I saw posted, I was not interviewed even though I had atleast some job experience in the positions posted. It also became apparent that of all the inmates who were called for interviews, none were black inmates like my self. I filed a grievance on the matter. See Exibit (s) 96 (b), and (c), respectively; 96 (b) (level III Griev. Resp.; ref #990872982; re: Jobs & Prison Employment); and 96 (c); (level III Griev. Resp.; ref #990873065; re: Job discrim.; dated: 16 Nov. 09.). As noted in Exibit 96 (b); para. 5, The Grievance Hearing Officer states That plaintiff "bear the burden of proof, you have offered none except bare allegations. Your allegations of racial discrimination are unfounded."

Plaintiff went in search of documentation to support the allegation of racial discrimination on the basis of race and disability with respect to Prison employment. Plaintiff submitted a GRAMA Records Request but was denied the statistical data.

Plaintiff finally resorted to the Office of the State Of Utah Records Committee pursuant to GRAMA Statutes, and after a hearing was held, the Records Committee ruled in favor of the Plaintiff, see Exhibit 91, (Ut. Rec. Committ. Ord.; case # 10-3; dated: 2-18-10). The State neither appealed the Record Committee's Order, nor did they fully comply, as the order specifically required: "The appeal of petitioner, Lawrence M. Jackson is upheld and the $150.00 estimated actual cost of Respondent, The Department of Corrections shall be waived and Corrections shall provide Mr. Jackson the records/data [responsive] to his request without charge" (emphasis mine), id. at 6.

Because the defendants refused to provide the statistical data, "responsive" to plaintiff's request, petitioner has been without remedy for violations of plaintiff's U.S. Constitution: Amendment XIV (Privileges and Immunities Clause); and the (equal protection of the laws clause). Additionally, the Prison's Employee violated plaintiff's rights under Title II of the Americans With Disabilities Act, (ADA) of 1990, 104 Stat. 337, as amended 42 U.S.C. §12131 et seq. (2000 and Supp. II, when the States attorney, Ms. Sharel Reber, Assistant Utah Attorney General, at the hearing held by the Utah Records Committee, told the Records Committee that because of plaintiff's health, that plaintiff was not qualified for any UCI job positions and therefore not entitled to the statistical data requested. The State of Utah Records Committee, when petitioner requested enforcement of their own Order they denied the petition, see Exhibit 103, (Rec. Committ. Ltr.; dated: 5-13-80; re: resp. to Compl. for Non-compli. With Ord.).

It may be noteworthy that when plaintiff first made the (GRAMA) records Request Appeal to the Director of The Utah Department of Corrections, Mr. Thomas Patterson, Prison officials went to several Oquirrh facilities looking for black inmates to hire into positions that had previously had no black inmates in those positions plaintiff identified, (including skilled positions such as maintenance; plumbing, welding; machinists, HVAC, ect.). The Prison also began hiring several more black inmates in different areas of UCI and select Prison positions in response to my allegations of racial discrimination on the basis of race in Prison Employment. Therefore, these actions were also retaliatory because plaintiff raised the allegations. Prison officials moved to correct their racial bias and also keep plaintiff from obtaining one of those positions.

COUNT XI)

Prison's Contract Attorneys Denied Plaintiff any assistance with a State Habeas Corpus Petition. The denial caused Plaintiff to Not be Able to comply with state Procedural Rules Respecting Ut.R.Civ.P, Rule 65C Petitions. The contract Attorneys also Denied plaintiff any assistance in Responding to Martinez Report. The Omissions were A Denial of Access To The Courts.

In about September, 2005, Plaintiff filed a 28 U.S.C. §2254 Habeas Corpus Petition. On 9-16-09, the U.S. District Court - Utah entered a memorandum Decision dismissing the Petition as
(page 68)

"Ethernically exausted, barred by state procedural law, and proce edurally defaulted in this federal habeas case." see: Exibit 106 (U.S.D.C.-Ut Memo.Decis.; case # 2:05-cv-365 DB; entered: 9-16-09.).

The contract attorneys for the Utah State Prison's denial of assistance even at the State Habeas Corpus proceedings are the primary cause for the federal case being dismissed. The plaint iff submitted a copy of a interoffice memorandum from the contract Attorneys stating that a number of my claims were, in their view, without merit and or frivolous. They suggested that I remove certain arguments, or issues before they would assist me. I refused to drop the issues because they were important to me, and my case. I then filed the case on my own in the 8th District Court. Although the habeas court dis cussed many of the claims and disposed of them they also noted, (incorrectly), that plaintiff had raised the issue of ineffective assistance of appellate counsel for the first time in a memor andum in opposition to the State's motion for summary judgment and "thereby severely restricting the issues properly before the court.

Petitioner appealed to the Utah Court of Appeals, and this court of Appeals on it's own motion removed the appeal to the Supreme Court of Utah, as the Supreme Court had original jurisdict ion because the case involved a first degree felony. The Supreme Court of Utah, in an order "pouring the case over" back to the Utah Court of Appeals, and because the order did not expressly say

(pg. 68)

that the procedure was a "pour-over" procedure, and not a pass upon making a ruling in the case, and because the Prison's Contract attorneys had declined extending any assistance plaintiff mistook the Supreme Court of Utah's "pour-over" procedure as the Supreme Court's order passing upon the opportunity to make a ruling in the case, and plaintiff proceeded to the U.S. District Court under 28 U.S.C. §2254.

Because the Prison's Contract attorneys denied plaintiff legal assistance with the preparation and filing of the habeas corpus writs, or denied plaintiff any legal advice about state and federal procedural law, plaintiff's habeas corpus case was dismissed for failure to comply with state procedural law. The Contract attorneys thus denied plaintiff access to the courts which plaintiff believes violates the U.S. Constitution Amendments I, (right to petition the government for redress of grievances; and due process of law; and equal protection of the laws; Plaintiff also believe this also violates the U.S. Constitution, Article I section 9, (the suspension clause)).

COUNT XIII

The Prison's Level II and III Grievance Officials Occupied Positions That Allowed Them To Correct Issues Raised In The Grievances But did Nothing. Thus Defendant's Omissions violated The U.S. Constitution. The same as if they were the Actors In The Instances complained of In this Complaint.

(page 40)

The plaintiff herein raised at least (12), twelve issues.
The plaintiff submitted grievances to the third and final levels.
The issues were exausted with respect to administrative
remedies. The hearing officials at levels II and III were in a
position to equitably resolve the issues presented, but chose to
maintain the status quo.

The hearing officials, Billie Casper, Data Terminal Operator,
(DTO), and Tom Anderson, level III Hearing officer thus dep-
rived plaintiff of a remedy in each of the grievances submitted
and exausted. Thus, the officials named above were made
aware of constitutional violations, but they merely rubber stamped
the level one DTO's disposition, no matter how outrageous, in
this way the hearing officials, having recieved, and read the
grievances; they were thus given constructive notice of const-
itutional rights violations and therefore should be held just
as liable as their subordinates who were the actors in each
of the above counts.